AO 91, Rev. 11/82 (A. Wzorek Authorizing)

# CRIMINAL COMPLAINT

| United States District Court | DISTRICT<br>Eastern District of Pennsylvania |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JEFFREY WALKER | DOCKET NO. |
| | MAGISTRATE'S CASE NO.<br>13-650 M |

Complaint for violation of Title 18 United States Code §§ 1951, 924(c)(1), and 2.

| NAME OF JUDGE OR MAGISTRATE<br>Honorable THOMAS J. RUETER | OFFICIAL TITLE<br>U.S. Magistrate Judge | LOCATION<br>Philadelphia, PA |
|---|---|---|
| DATE OF OFFENSE<br>May 21, 2013 | PLACE OF OFFENSE<br>Philadelphia, PA | ADDRESS OF ACCUSED (if known)<br>6444 Woodcrest Avenue<br>Philadelphia, PA 19151 |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about May 21, 2013, in Philadelphia, Pennsylvania, defendant JEFFREY WALKER did knowingly and unlawfully obstruct, delay, and affect commerce, and the movement of articles and commodities in commerce, by robbery and extortion, in that JEFFREY WALKER by means of actual or threatened force or violence or fear of injury, immediate and future to the victim's person, and by use of a firearm; and by use of his position as a Philadelphia Police Officer, did obtain personal property, cash, and marijuana unlawfully from another, with and without his consent, which was not due JEFFREY WALKER, because of his position as a Philadelphia Police Officer, and thus, under color of official right. All in violation of Title 18, United States Code, Sections 1951, 924(c)(1) and 2.

MatBASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

SEE AFFIDAVIT ATTACHED HERETO.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED:

Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.

SIGNATURE OF COMPLAINANT (official title)
Denis Drum
OFFICIAL TITLE
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence.

SIGNATURE OF MAGISTRATE (1)
Honorable THOMAS J. RUETER, United States Magistrate Judge

DATE
5/22/13

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AFFIDAVIT     13-650 M

I, Denis Drum being duly sworn according to law, hereby depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation. I have been employed by the FBI for over twenty-two years. For the last one and a half years, I have conducted public corruption investigations including numerous police corruption investigations. I also am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2. The information and facts set forth in this Affidavit are based on my personal knowledge, information provided to me by other investigators assigned to this matter, statements of witnesses, and documents obtained in the course of the investigation by grand jury subpoenas and through other sources. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support an arrest warrant in this matter.

3. JEFFREY WALKER has been employed by the Philadelphia Police Department (PHPD) since June 1989. He is currently assigned to the Narcotics Field Unit, ("NFU"). WALKER has been assigned to the NFU since March 1999. The NFUs are tasked with investigating drug dealers and drug organizations within the city of Philadelphia.

4. A cooperating witness (Person #1), told the FBI that WALKER recently had approached him and told him that he wanted Person #1 to set up drug dealers so that WALKER could rob them.

5. Starting on May 6, 2013, Person #1 met with WALKER at the FBI's direction and had conversations with him, either face to face or on the telephone. During the conversations, WALKER proposed a number of plans to Person #1 which involved Person #1 setting up a drug dealer so that WALKER could rob this drug dealer of some or all of his drugs and money. During each conversation, WALKER's plans for how to conduct this robbery continuously changed.

6. On May 6, 2013, Person #1 met with WALKER and recorded the meeting. During the conversation, Person #1 told WALKER that he was dealing with an individual who was dealing with a large amount of drugs and money. WALKER told Person #1 that he wanted to find out where the individual lived so that he could rob him. WALKER advised that he wanted to rob the individual on a Monday because that is his day off and he does "all my dirt on Mondays." WALKER also described how in the course of stopping a car for suspected drug violations, he could take a larger portion of the drugs in the car for himself and leave a smaller amount behind which would be the amount WALKER claimed to the suspect that he found. WALKER also indicated he would then supply the drugs to Person #1, telling him that once he gave the drugs to Person #1, that was on him. WALKER also told Person #1 about another plan to rob the drug dealer in which WALKER would steal half a brick of marijuana

right from the drug dealer's possession after he had been setup by Person #1. WALKER stated, "Let me grab the mother fucker as he has the brick already on him. I could rob him for the half a brick."

7. On May 10, 2013, Person #1 again met with WALKER and recorded the meeting. WALKER told Person #1 that he had an individual who could give WALKER an amount of powder cocaine. WALKER told Person #1 that once Person #1 found out what was in the house of the drug dealer, hereinafter referred to as Person #2, that Person #1 should call WALKER. At that point, WALKER said that Person #1 should go out with the drug dealer to get a drink. WALKER advised that he would then pull over the car, plant some drugs, and arrest the drug dealer (Person #2). WALKER advised that he would then take the keys of the drug dealer, go to the drug dealer's house and take the money found inside.

8. On May 17, 2013, during a recorded conversation, WALKER and Person #1 again discussed their plans to rob Person #2. WALKER told Person #1 that when they get in the Person #2's house to steal the drugs and money, that whatever they found in the house, half would be Person #1's. WALKER also told Person #1 to be sure to use gloves when they break in. WALKER also told Person #1 that they would divide the money, at one point saying they would be rich and at another point saying we will divide it down the middle.

9. During a conversation that occurred on May 20, 2013, WALKER explained to Person #1 that he (WALKER) could obtain a couple ounces of cocaine which he could then throw in the car of Person#2 so that Person#2 could be falsely arrested. At one point in the conversation, WALKER told Person#2, that he'd have his people stop him, and he'd throw the drugs in his car, and go from there. WALKER also then described to Person #1 how they would go back to Person#2's house after Person#2 had been arrested. WALKER told Person #1 that after they had taken the drugs and money they would go somewhere and "break it up," that is, split it between them. During the course of this conversation, Person #1 told WALKER that Person #2 dealt drugs "down South."

10. On May 21, 2013, at FBI direction, at approximately 5:20 p.m., Person #1 and Person#2 parked a black Volkswagen Jetta, bearing Virginia license plate XNB-7771, in the vicinity of Spiro's Bar, located at 3962 W. Girard Ave., Philadelphia, PA. Person #1 and Person#2 exited the Jetta and proceeded into the bar. At approximately 5:40 p.m., WALKER drove up near the Jetta and exited his vehicle. WALKER opened a door to the Jetta and appeared to place something in the vehicle. WALKER closed the door and returned to his vehicle. At approximately 5:44 p.m., Person #1 received information from WALKER indicating that he (WALKER) had placed drugs in the Jetta.

11. At approximately 6:00 p.m., Person #1 and Person#2 exited Spiro's Bar. WALKER was observed in his vehicle parked outside of Spiro's. Person#2 drove away from the area by himself in the Jetta. WALKER also drove from the area, and began following the Jetta. At approximately 6:25 p.m., Person#2's vehicle was pulled over by a Philadelphia Police vehicle

on 6th Street between Vine Street and Race Street. Two uniformed officers and WALKER were observed outside of Person#2's car. At the time, it is believed that WALKER was armed with his loaded service revolver, a Glock 21.

12. At approximately 7:13 p.m. another Philadelphia Police vehicle arrived at the location of Person#2's Jetta on 6th Street. An officer with a canine exited the second marked unit and appeared to conduct a sniff search of the vehicle. At approximately 7:22 p.m., WALKER drove away from the area in his vehicle and contacted Person #1 and indicated that he had the key to Person#2's home.

13. A Philadelphia Police Department Arrest Report (PARS), authored by WALKER, was generated concerning the arrest of Person#2. The PARS indicated that Highway Patrol officers observed a black Volkswagen Jetta bearing Virginia license plate XNB-7771 driving erratically at a high rate of speed traveling eastbound on Interstate 676 at approximately 6:20 PM. The officers followed the Jetta traveling south on 6th Street. The report further indicates that Officer WALKER was driving in the area, observed what was occurring, and pulled in front of the Jetta. The stop occurred in the vicinity of 6th Street and Race Street.

14. The PARS indicated that one of the Highway Patrol officers observed Person#2 place an object under the seat. Person#2 was removed from the vehicle and the officer located a "dark colored Arizona bottle" under the seat. A large, solid object was inside the bottle. The Highway Patrol officer believed that the bottle contained narcotics and requested a K-9 Unit to the location. The K-9 Unit responded to the location and the narcotics canine performed a sweep of the vehicle, with the canine providing a positive indication for the presence of narcotics. WALKER then directed the Highway Patrol officers to take the Jetta to the Narcotics Field Unit (NFU) Headquarters pending a search warrant. The PARS indicated that a search warrant was executed by members of the NFU at approximately 9:50 p.m. A clear knotted baggie containing bulk cocaine with the weight of 28 grams was found in the Arizona bottle. The PARS further stated that WALKER conducted a Nik Test G on the alleged cocaine with a positive reaction for cocaine." The PARS indicated it was completed by WALKER.

15. At approximately 11:12 p.m., WALKER was observed leaving the NFU parking lot driving his personal vehicle. At approximately 11:39 p.m., WALKER was observed exiting his vehicle in the vicinity of 5646 Florence Avenue, Philadelphia, PA, the alleged house of Person#2. Person #1, who was parked in the area, exited his vehicle and met WALKER. At approximately 11:42 p.m., WALKER and Person #1 entered the front door of 5646 Florence Avenue. At approximately 11:48 p.m. WALKER and Person #1 exited 5646 Florence Avenue. WALKER and Person #1 were taken into custody. WALKER had approximately $15,000 in his possession, which was the alleged proceeds of drug sales, which he had taken from the location. WALKER had in his possession his service revolver at this time. Person #1 had approximately five pounds of marijuana.

16. After his arrest, WALKER admitted planning the false arrest of Person #2, planting the cocaine in Person #2's vehicle, taking a key from Person #2, using that key to enter Person #2's alleged house, and taking approximately $15,000 found inside.

*[signature]*

DENIS DRUM
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to
before me this 22nd day of May, 2013.

*[signature]*

HONORABLE THOMAS J. RUETER
U.S. Magistrate Judge